UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DEBRA L. LEATZAW,

                        Plaintiff,              05-CV-6364T

v.                                              **DECISION**
                                                **And ORDER**
JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

_____


                        <u>INTRODUCTION</u>

        Plaintiff, Debra L. Leatzaw ("Leatzaw" or "plaintiff") filed
this action seeking review of a final decision by the Commissioner
of Social Security ("Commissioner") denying her application for
Supplemental Security Income ("SSI") under Title XVI of the Social
Security Act ("SSA"), 42 U.S.C. § 1382, 1382c(a) and Disability
Insurance Benefits ("DIB") under Title II of the Social Security
Act, 42 U.S.C. § 416(I), 423(d).   Jurisdiction to review the
Commissioner's decision arises under 42 U.S.C. § 405(g).   On
January 24, 2006 Leatzaw moved for judgment on the pleadings.   On
February 15, 2006, pursuant to Rule 12(c) of the Federal Rules of
Civil Procedure, the Commissioner moved for judgment on the
pleadings affirming that Leatzaw is not eligible for SSI or DIB.

        For the reasons that follow, this Court finds that the
Commissioner's decision is not supported by substantial evidence
and accordingly I grant the plaintiff's motion for summary judgment

and determine that plaintiff is "disabled" pursuant to 42 U.S.C. § 423(d).

## PROCEDURAL HISTORY

The plaintiff filed for disability insurance and SSI benefits on July 9, 2002. (Tr. 49-51). Leatzaw was informed on September 17, 2002 that her applications were denied. (Tr. 35-40, 181-86). Pursuant to the plaintiff's request, an administrative hearing was held on July 27, 2004 before an Administrative Law Judge ("ALJ") at which time plaintiff appeared with counsel and testified. (Tr. 187-209). Vocational expert Julie Andrews was also present and testified. (Tr. 205-09). Plaintiff's case was considered *de novo* and on August 16, 2004 the ALJ found that the plaintiff was not disabled because Leatzaw's medically determinable impairments do not meet or equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 and that there are a significant number of jobs in the national economy that the plaintiff can perform. (Tr. 26-7). On May 10, 2005 the Appeals Council denied plaintiff's request for review. (Tr. 5-7). This action followed.

## BACKGROUND

A. Non-Medical Evidence and Hearing Testimony

Plaintiff was born on May 8, 1963 (Tr. 49). She was previously married and has three children. (Tr. 49-50). Leatzaw currently lives at her sister's house in Rochester, New York, with her minor children. (Tr. 78-9). Leatzaw receives $600 a month for

2

child support, does not have a savings account and had only a minimal amount in her checking account on July 9, 2002. (Tr. 179, 81, 192). The plaintiff was denied Workers Compensation benefits on July 17, 2002. (Tr. 63).

Plaintiff attended two years of college at the Rochester Business Institute and earned an Associate's Degree in Administrative Information Processing and Data Entry. (Tr. 190). Her employment history includes being a receptionist at a fitness center, a data entry clerk at a marketing firm, an assistant manager for a property management firm and a commercial cleaner for a refinishing company. (Tr. 85, 101). Her last job was working as an inventory redesigning specialist at Strong Memorial Hospital on March 2002. (Tr. 190). Leatzaw testified that she has gone on a number of job interviews since leaving Strong Memorial, but due to wrist and hand pain in both arms, has not been able to obtain a job. (Tr. 190-1).

The plaintiff testified that her pain was not confined to her wrists and hands, but spread throughout her body in a period of months. (Tr. 193). Leatzaw testified that she was examined by various doctors and was diagnosed with various ailments including carpal tunnel, multiple sclerosis, neuropathy and Lupis. (Tr. 194). Dr. Dobrzynski, her primary care physician, eventually diagnosed plaintiff with fibromyalgia in January 2003, which was verified by Dr. Deane. Id. The plaintiff stated that her doctors

3

prescribed aerobic exercise three times a week however if she swam for over 45 minutes her system would flare up which would require her to be confined to her bed for a couple of days.  Id.  Plaintiff was taking Amitriptyline, Paxil and Carisprodol at that time along with Excedrin Migraine for migraines that usually occur about every other day and last for about eight hours.  (Tr. 204).

The plaintiff testified that after she sends her children off to school in the morning she would go back to bed due to fatigue.  (Tr. 197).  After bed rest she testified that she may be able to do some chores around the house including laundry and washing dishes, but these activities cause fatigue and she must sleep.  Id.  When she wakes up, she cooks "something simple" and helps her children with their homework.  (Tr. 197-8).  When she is not able to cook, her sister would then prepare the meals. (Tr. 80).  Leatzaw testified that there are days when she cannot get out of bed due to fatigue or pain in her bones and joints. (Tr. 198).

Julie Andrews, a vocational expert ("VE") testified at the July 27, 2004 administrative hearing.  (Tr. 205-9). Ms. Andrews was asked by the ALJ hypothetically to assume a person of plaintiff's age and educational background who was precluded from her former work and able to perform unskilled, low stress, light work with a sit/stand option, but could not work around hazards.  (Tr. 206).  This work was defined as one- and two-step

4

processes, routine and repetitive tasks, primarily working with things rather than people and entry level. <u>Id.</u> Based upon this hypothetical the VE testified that the plaintiff could perform the jobs of small products assembler (<u>Dictionary of Occupational Titles</u> ("DOT") Code No. 706684-022), and counter clerk (DOT Code No. 249.366-010). (Tr. 207). The VE testified that there are 513,000 positions in the national economy and 1,950 positions in the Finger Lakes Region for small products assembler and 93,500 positions in the national economy and 310 positions in the Finger Lakes Region for counter clerk. <u>Id.</u> The VE also testified that the plaintiff's lack of concentration due to pain and her need to lie down three times a day for one to three hours a day would negatively affect performing both jobs in that she would not be able to perform either of these positions full-time as required. (Tr. 207-8).

B. <u>Medical Evidence</u>

On April 22, 2002 Leatzaw was examined by orthopedist, Dr. Todd Stein for numbness in her hand. (Tr. 108). Plaintiff complained that she had pain in her elbow, soreness in her arms and loss of strength in her hands. Dr. Stein's impression was that she was suffering from a work-related carpal tunnel syndrome. She had been put on a home exercise program by her primary care physician, Dr. Dobrzynski. Plaintiff had full range of motion in her neck, shoulders, wrists and elbows. She was sore over her volar forearms

but had no obvious atrophy and normal gross strength. The plaintiff's grip strength was seventy-five pounds on the right and sixty-five on the left. Dr. Stein concluded that Leatzaw was totally and temporarily disabled. Id.

On May 2, 2002 Leatzaw returned to Dr. Richard Miller for evaluation of bilateral wrist and hand pain, weakness, numbness and tingling. (Tr. 102). Leatzaw claimed that the pain began in January 1, 2002 as a result of an unknown work-related problem. Plaintiff claimed that there was numbness and tingling in her feet sometimes extending to the mid-calf level, as well as pain and weakness in both wrists, numbness in both hands extending to mid forearm and shooting pain from the wrist up to the forearm. Upon examination Leatzaw's cervical spine showed full, free range of motion without pain. Her shoulders, elbows, wrists, and small joints of the hand had full and free range of motion bilaterally. Strength was normal across the joints and there was no focal tenderness. Dr. Miller assessed migratory bilateral hand and wrist pain with radiation to the forearms and encouraged gentle strengthening and stretching exercises. Dr. Miller indicated that there may be some restrictions warranted as pertains to work due to Leatzaw's symptoms becoming troublesome after working for a period of time. Dr Miller opined that Leatzaw's clinical course be monitored by Dr. Dobrzynski. Id.

Leatzaw returned to Dr. Stein on May 11, 2002 for a follow-up on the EMG performed by Dr. Speech. (Tr. 107). The EMG and neurological test of the Leatzaw's ulnar median nerves was normal. Dr. Stein concluded that the plaintiff is not suffering from an obvious carpal tunnel syndrome and shows no evidence of cervical radiculopathy. Plaintiff had been scheduled for a blood test and a neurology appointment by Dr. Dobrzynski. Id.

On June 11, 2002 Leatzaw was evaluated by neurologist, Dr. Allen Pettee. (Tr. 147-9). All of the results of the electrophysiological studies were normal. (Tr. 148-9). Dr. Pettee observed that Leatzaw's arm and leg numbness and tingling were more concerning for myelopathy than polyneuropathy. (Tr. 148). Dr. Pettee concluded that plaintiff may be suffering from myelopathy from multiple sclerosis as well as Lyme disease and lupus. An MRI of Leatzaw's head and cervical spine was arranged along with blood studies to include a Lyme titer and lupus anticoagulant. Id.

On June 21, 2002 Leatzaw underwent evoked potential studies at Strong Memorial Hospital to rule out demyelinating disease. (Tr. 110). All results were within normal limits. Id.

On July 8, 2002 Dr. Dobrzynski concluded that plaintiff was "currently disabled due to bilateral arm pain and numbness." (Tr. 170).

7

On July 16, 2002 Leatzaw returned to Dr. Pettee.  (Tr. 145).
Dr. Pettee stated that plaintiff's head MRI was normal with no
demyelinating disease identified.   The cervical spine MRI
identified degenerative bulging at the C4-5, C5-6 and C6-7 disc
levels.  Blood studies were unremarkable, except for her anti-
cardiolipin antibody titer for IgM.  Her Lupus anticoagulant was
negative.   Dr. Pettee concluded that  Leatzaw's neurological
symptoms were atypical for polyneuropathy and radiculopathy.  Id.
Dr. Pettee's MRI argued against a diagnosis of multiple sclerosis.
(Tr. 146).  Leatzaw's complaints of joint pain and the abnormal
anti-cardiolipin antibody titer made Dr. Pettee consider a lupus-
related phenomenon.  (Tr. 145-6).  Dr. Pettee ordered the plaintiff
to undergo spinal imaging with a lumbar spine MRI due to her
history of lower back problems and to evaluate for a right S1
radiculopathy and a repeat blood study.  Leatzaw was instructed to
continue wearing splints on her wrists.  Id.

On August 27, 2002 Dr. James Tacci, State Consultative
Examiner, conducted a consultative internal medicine examination.
(Tr. 113-8).  Plaintiff reported fatigue and joint pain that
affected her elbows, wrists, fingers, knees, and ankles
bilaterally.  Leatzaw characterized the pain as intense and that
Celebrex helps to relieve some of the pain.  (Tr. 113).  There are
no MRI or CT results.  Leatzaw reported having migraine headaches
that occur daily and have a duration of one to three days.  Leatzaw

reported taking 20 mg of Paxil, 50 mg of Vioxx, Excedrin Migraine, Imitrex when needed, Albuterol inhalers for pulmonary symptoms, 200 to 600 mg of Celebrex and 37.5 to 325 mg of Ultracet. (Tr. 114). Leatzaw only used wrist splints "to support driving and prevent possible injury" and no other assistive device. (Tr.115). Plaintiff reported she has difficulty walking and climbing stairs due to joint pain in her knees and ankles. Id.

Leatzaw also related that she can cook, clean the home, do laundry, shop, manage money, care for children, socialize with friends, shower, bathe and dress herself. When asked why she couldn't work Leatzaw responded, "Hand, arm pain, migraines, eyes." Id. Vision in both of Leatzaw's eyes are 20/20 and she has a normal gait. (Tr. 116). Plaintiff had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally. Muscle strength was 5/5 bilaterally in upper extremities and lower extremities and cervical and thoracic spine examination was normal. Lumbar spine exam showed full flexion and full lateral movements and no spasm or point tenderness. Id. Dr. Tacci found that Leatzaw had full range of motion of hips, knees and ankles bilaterally. (Tr. 117). Deep tendon reflexes were physiologic and equal. Hand and finger dexterity was intact and grip strength was 5/5 bilaterally. Dr. Tacci reported that plaintiff shows no evidence of significant memory impairment or impaired judgment. Id. Dr. Tacci concluded that plaintiff was without limitation with

respect to most any usual and customary upper and lower extremity activities and any and all usual and customary activities. (Tr. 117-8).

On the same day Leatzaw underwent a psychological consultative examination performed by psychologist, Dr. Christine Ransom. (Tr. 121-5). Plaintiff reported that she had been treated for depression for five years by Dr. Lawstuss and was prescribed Paxil for the past six years. (Tr. 121). (Tr. 124). Dr. Ransom diagnosed Leatzaw with major depressive disorder, which was currently mild. Id.

On September 9, 2002 Leatzaw returned to Dr. Pettee. (Tr. 142-4). Dr. Pettee reported that a lumbar spine MRI performed on July 19, 2002 showed bulging annuli at L1-2 through L5-S1 with a small left lateral disc herniation at L3-4 and a small central disc herniation at L4-5, but without definitive spinal canal stenosis and no right sided nerve root compression identified. (Tr. 142). The anticardiolipin antibody titer and EMG studies were normal. (Tr. 144). Dr. Pettee concluded that there was no carpal tunnel syndrome to explain Leatzaw's hand numbness and no evidence to explain her foot numbness. Dr. Pettee believed that there was a rheumatologic cause for her arm and leg numbness and disabling fatigue. He referred Leatzaw to rheumatologist, Dr. Susan Ristow and wrote plaintiff a prescription for 100 mg of Amantadine for fatigue. Id.

10

The record contains treatment notes from the plaintiff's primary care physician, Dr. Dobrzynski dated February 25, 2003 to February 17, 2004.  (Tr. 167-9).  On June 19, 2003 Dr. Dobrzynski reported that Vioxx was helping out, but Leatzaw was "still struggling a lot." (Tr. 168).  On October 1, 2003 Dr. Dobrzynski noted that plaintiff had chronic pain syndrome consistent with fibromyalgia.  (Tr. 168).  At this visit Leatzaw complained of decreased concentration, lack of any energy and some memory loss.  On February 25, 2003 Dr. Dobrzynski noted that Leatzaw's hand pain was getting a little better and he prescribed a 10 day trial of prednisone.  (Tr. 169).

On July 14, 2003 Leatzaw was examined by Rheumatologist, Dr. Peter Deane.  (Tr. 159-64).  Plaintiff had tender upper body fibromyalgia points with negative lower body control points.  (Tr. 160).  He discussed proper cane use with Leatzaw and indicated that she had a "background of osteoarthritis" which Dr. Deane felt had been responding to anti-inflammatories.  (Tr.160).  Dr. Deane concluded that Leatzaw is suffering from a condition known as fibromyalgia and sleep disturbances that accompany fibromyalgia and her need for restorative sleep.  (Tr. 161).  Dr. Deane prescribed ninety 25 mg tablets of amitriptyline to help with restorative sleep and noted that aerobic conditioning could help reduce the need for medication.  (Tr.162).

11

On December 16, 2003 Dr. Dobrzynski referred Leatzaw to Dr. Deane for a fibromyalgia reevaluation.  (Tr. 167).

On June 28, 2004 Dr. Deane completed another medical assessment in which he diagnosed Leatzaw with primary fibromyalgia. (Tr. 175).  Dr. Deane reported that plaintiff has debilitating fatigue that does not go away with bed rest, a sleep disorder with morning stiffness and the existence of diffuse aches and pain. Dr. Deane also reported that through physical examination, laboratory tests and patient's history other diseases that could cause similar symptoms were ruled out.  Id.  He concluded that Leatzaw's complaints of pain and fatigue were consistent with his objective findings and that she could not perform light sedentary work on a "regular and continuing basis", which he defined as eight times a day for five days a week.  (Tr. 177).

<u>LEGAL STANDARD</u>

A.   <u>Jurisdiction and Scope of Review</u>

Jurisdiction to hear claims based on denial of Social Security benefits is granted to district courts through 42 U.S.C. § 405(g). Under 42 U.S.C. § 405(g) the Court must accept the findings of fact made by the Commissioner if such findings are supported by substantial evidence in the record.  Substantial evidence consists of "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison Co. v. N.L.R.R.</u>, 305 U.S. 197, 229 (1938).

Under the substantial evidence standard the court's inquiry is "whether the record read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the law judge." Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).

B.   Legal Standards

Leatzaw contends that she is entitled to SSI and DIB benefits as provided in Title II and XVI of the Social Security Act.

To receive benefits under either statute a claimant must demonstrate their inability to engage in a substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

"An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."   42 U.S.C. § 423(d)(2)(A), 1382c(a)(3)(B).

In evaluating disability claims, the Commissioner instructs adjudicators to follow the five step process promulgated in

13

20 C.F.R. §§ 404.1520 and 416.920.  First the Commissioner must
determine whether the claimant is engaged in any substantial
gainful activity.  Second, if the claimant is not engaged in any
substantial gainful activity, the Commissioner must determine
whether the claimant has a severe medically determinable physical
or mental impairment that meets the duration requirement in
20 C.F.R. § 404.1509 of 12 months unless the impairment is likely
to result in death.  Third, if the claimant does suffer such an
impairment, the Commissioner must determine the severity of the
impairment and whether it meets or equals a listing in Appendix 1,
Subpart , Regulation No. 4.  20 C.F.R. § 404.1520(a)(4)(iii).  If
the impairment(s) is not the equivalent of a condition on the list
the fourth inquiry is whether the claimant is able to perform any
past work.  If the claimant is not able to perform any past work
then the final inquiry is whether the claimant can perform any
other work.  The burden of proving the first four elements is on
the claimant, while the burden of proving the fifth element is on
the Commissioner.  <u>Bush v. Shalala</u>, 94 F.3d 40, 45 (2d Cir. 1996).

<u>DISCUSSION</u>

In this case the ALJ properly followed the five step procedure
in 20 C.F.R. §§ 404.1520 and 416.920.  The ALJ found that the
plaintiff: (1) had not engaged in substantial gainful activity
since the onset of disability; (2) suffered from fibromyalgia,
degenerative changes of the cervical and lumbar spine, mild

degenerative joint disease of the knees, migraines, and a major depressive disorder, which were considered "severe" based on the requirements in 20 C.F.R. §§ 404.1520(c) and 416.920(b); (3) did not have an impairment meeting or medically equivalent to one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; (4) was unable to perform any of her past relevant work; and (5) could perform a significant number of jobs in the national economy. (Tr. 25-6).

   A.   The Medical Evidence

   Fibromyalgia ("FMS") is characterized as a chronic, degenerative disorder which causes pain, tenderness and stiffness in the fibrous connective tissues in one's body. The Merck Manual, 1271 (15th ed. 1987). Leatzaw was diagnosed with primary fibromyalgia by rheumatologist Dr. Deane on July 14, 2003. (Tr. 176). There is no cure for fibromyalgia and the condition is still poorly understood within the medical community. Benecke v. Barnhart, 379 F.3d 587, 590 (9th Cir. 2004).

   Diagnosis of primary fibromyalgia "is by recognition of the typical pattern of diffuse fibromyalgia and nonrheumatic symptoms (eg. poor sleep, anxiety, fatigue, irritable bowel syndrome) and by exclusion of other systematic diseases. The Merck Manual, supra, 1271. The most accurate signs for fibromyalgia "are primarily the tender points." See SSA Memorandum, Fibromyalgia, Chronic Fatigue Syndrome, and Objective Medical Evidence Requirements for

15

Disability Adjudication, at 5 (May 11, 1998).  In his July 14, 2003 diagnosis Dr. Deane found tenderness in at least 11 of the 18 trigger points as well as pain in all four quadrants of the body. (Tr. 175).

The ALJ erred when he did not "accept Leatzaw's subjective statements concerning her symptoms and limitations" because her "subjective complaints are not consistent with the objective medical evidence" (Tr. 23).  "Subjective pain may serve as the basis for establishing disability even if . . . unaccompanied by positive clinical findings of other medical evidence."  Green-Younger v. Barnhart, 335 F.3d 99, 108 (2nd Cir. 2003)(citing Cruz v. Sullivan, 912 F.2d at 8, 12 (2d Cir. 1990)).  Indeed, 20 CFR §§ 404.1520(b) and (d) require the ALJ to consider claimant's subjective complaints about her symptoms "such as pain, fatigue, shortness of breath, weakness or nervousness." Fragale v. Chater, 916 F.Supp. 249 at 252 (W.D.N.Y. 1996).  "An individual's symptoms and the effects of those symptoms on the individual's functional abilities must be considered both in determining impairment severity and in assessing the individual's functional capacity." See SSA Memorandum, Fibromyalgia, Chronic Fatigue Syndrome, and Objective Medical Evidence Requirements for Disability Adjudication at 4 (May 11, 1998).  "Objective findings are not required to find that an applicant is disabled." Green-Younger, 335 F.3d at 108

16

(citing Donato v. Sec. of Dep't. Of Health and Human Services, 721
F.2d 414, 418-9 (2d Cir. 1983)).

The ALJ also found that Leatzaw's allegations regarding her
limitations were not credible because her statements described
varying degrees of pain in multiple areas and that she ". . . has
exaggerated her symptoms and limitations." (Tr. 22). Yet, on
July 14, 2003, rheumatologist, Dr. Deane reported that Leatzaw's
complaints of pain and fatigue throughout her body were consistent
with his objective findings (Tr. 177). The plaintiff had
repeatedly complained about her disabling fatigue that did not go
away with bed rest, which was verified by her rheumatologist,
Dr. Deane on July 14, 2003 (Tr. 113, 144, 175, 197). The pain
caused by fibromyalgia is accompanied by fatigue and a sleep
problem called non-restorative sleep, where the patient never feels
rested no matter how long they sleep. Stedman's Medical Dictionary
at 671 (27th Ed. 2000). "[Fibromyalgia] is a systemic disorder
consisting of symptoms and signs that may vary in incidence,
duration, and severity. The hallmark of [fibromyalgia] is the
presence of clinically evaluated persistent or relapsing chronic
fatigue that is of slow or definite onset which cannot be explained
by another diagnosed physical or medical disorder, or the result of
ongoing exertion. It is not substantially alleviated by rest and
results in substantial reduction in previous levels of
occupational, educational, social, or personal activities." See

SSA Memorandum, P. 3 (May 11, 1998) supra.   To help with her sleeping disorder, the plaintiff was prescribed Amitriptyline to help her get restorative sleep (Tr.161).   Both Dr. Dobrzynski and Dr. Deane concluded that Leatzaw suffers from debilitating fatigue that does not go away with bed rest (Tr. 174-5).   Leatzaw testified that there are days when she simply could not get out of bed (Tr 198).

The plaintiff presented a medical profile consistent with the principal symptoms of fibromyalgia; "pain all over," fatigue, disturbed sleep, and stiffness. See Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996)(explaining common symptoms associated with fibromyalgia).   The ALJ's opinion also stated that Leatzaw had never been prescribed treatment for any respiratory problem or even found it necessary to seek any mental health treatment (Tr. 17, 22).   Indeed, Leatzaw was been prescribed Albuterol inhalers for pulmonary symptoms and was also in private treatment for depression with Dr. Lawstuss, for five years  (Tr. 114, 121).   The plaintiff was also prescribed Imitrex for migraine headaches as well as Celebrex, Vioxx and Carisprodol in an attempt to control her pain and stiffness.

Plaintiff's disability from fibromyalgia has progressed to the point where she is unable to move without assistance.   She testified that she wears wrist splints and was instructed of proper cane use by Dr. Deane on July 14, 2003 (Tr. 115, 159-60).

B.   The ALJ erred in not granting the opinions of the plaintiff's treating physicians (Dr. Dobrzynski and Dr. Deane) greater weight than the opinion of Dr. Tacci.

The rheumatologist's opinion in a case involving fibromyalgia is entitled to greater weight than those of non-treating physicians because it is an "opinion of a specialist about medical issues related to his or her area of specialty."  20 C.F.R. § 404.1527(d)(5); Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004).  The ALJ's decision finding that Leatzaw was able to perform work-related activities relied upon the opinion of State consultative examiner Dr. Tacci, who examined Leatzaw on one occasion in August 2002.  Dr. Tacci concluded that Leatzaw had full range of motion in her shoulders, elbows, forearms and wrists as well as muscle strength at 5/5 of the upper extremities  (Tr. 20, 113-8).  The ALJ also pointed to Dr. Deane's observation that plaintiff's "knees were without crepitus, redness, warmth, swelling or tenderness" to establish that Leatzaw was not disabled (Tr. 21).  The absence of swelling joints or other orthopedic and neurologic deficits however, "is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced."  Green-Younger, 335 F.3d at 109 (citing Sarchet, 78 F.3d at 306).

19

The ALJ also erroneously considered claimant's ability to engage in some of life's ordinary daily activities to support his finding that the claimant retained an ability to work.  In a case involving fibromyalgia, the ability to engage in some activities, such as cooking, cleaning, and hobbies, does not does not establish the ability to perform substantial gainful work.  <u>Forehand v. Barnhart</u>, 364 F.3d 984, 988 (8th Cir. 2004).  Although the vocational expert testified hypothetically that the plaintiff could perform the job of counter clerk or a small products assembler, she qualified that opinion by stating that someone who is not able to perform these functions in a normal eight hour working day (or one subject to time off because of disability) could not reasonably be expected to perform either of these jobs.  The vocational expert testified that Leatzaw's lack of concentration due to pain and her need to lie down three times a day for one to three hours would also negatively affect her ability to perform both jobs full time (Tr. 207-8).

I conclude from the record that the ALJ erred by failing to give controlling weight to the opinions of Dr. Deane and Dr. Dobrzynski and effectively requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines.  Both Dr. Dobrzynski and Dr. Deane relied upon the plaintiff's subjective complaints over the extensive period of their treatment which did not undermine their

opinions as to her limitations, because "[a] patient's report of complaints, or history, is an essential diagnostic tool," <u>Flannery v. Chater</u>, 110 F.3d 346, 350 (8th Cir. 1997).  Therefore, the ALJ's conclusion that the plaintiff's complaints were not consistent with the medical evidence and that she was not "entirely credible" and thus could not "fully accept her subjective statements concerning her symptoms and limitations" were at most consistent with the opinion given by Dr. Tacci as a result of his single examination of the plaintiff on August 27, 2002, but certainly not consistent with her treating physicians' opinions based on extensive contact and treatment of the plaintiff.

CONCLUSION

I find that the ALJ's decision that the plaintiff is not disabled is erroneous and is not supported by substantial evidence. I also find there is substantial evidence in the record to support the plaintiff's claim of disability and her entitlement to disability benefits.  Accordingly, this case is remanded to the Secretary for immediate calculation and payment of benefits.

ALL OF THE ABOVE IS SO ORDERED.


S/Michael A. Telesca
_____
Michael A. Telesca
United States District Judge

DATED: Rochester, New York
       July 6, 2006